UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTOPHER MICHAEL SAMMONS,

      Defendant.

:

:

:

Case No. 2:19-cr-107
Judge Sarah D. Morrison

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant Christopher Michael Sammons's Motions to Dismiss (ECF No. 50, 51). Government has responded to Mr. Sammons's Motions (ECF No. 52). These matters are now ripe for consideration.

### I.

On April 5, 2019, the Government filed a criminal complaint charging Mr. Sammons with violations of federal law pertaining to child sexual exploitation and the production and distribution of child sexual abuse imagery (commonly referred to as "child pornography"). (Compl., ECF No. 1.)

    A.    **Factual Background**

The complaint was supported by the Affidavit of FBI Task Force Officer Brett M. Peachey. (Peachey Aff., ECF No. 1, PAGEID 2.) TFO Peachey's affidavit is

1

summarized below, together with additional facts presented by the parties in their briefing.

### 1. Chats with Agent Hurst

FBI Special Agent Richard Hurst is based in Arkansas and works undercover to identify individuals engaging in the online sexual exploitation of children. (Peachey Aff. ¶ 3.) On March 11, 2019, Agent Hurst received a message from Mr. Sammons on "a popular mobile application which is advertised as being an anonymous form of social media." (*Id.*) Agent Hurst and Mr. Sammons discussed their "mutual sexual interest in children." (*Id.*) During this conversation, Mr. Sammons "claimed that he was sexually active with a six-year-old family member (hereinafter referred to as Jane Doe)." (*Id.*) On hearing Agent Hurst's claim that he also sexually abused a fictitious minor family member, Mr. Sammons "offered to 'share her [Jane Doe] next time if you're interested in a long term thing.'" (*Id.*)

Agent Hurst and Mr. Sammons subsequently moved their conversation to the Kik mobile application, where Mr. Sammons messaged under the username "Cw3x." (*Id.* at ¶ 4.) Over the course of their conversation, Mr. Sammons described his sexual abuse of Jane Doe and claimed to have previously "recorded himself inserting a 'butt plug' into Jane Doe's anus and offered 'I'll have to do it again to show you.'" (*Id.* at ¶ 7.) Mr. Sammons explained, "[g]ot other vids but of her [Jane Doe] I don't keep anything saved just incase (sic) you know." (*Id.* at ¶ 5.)

Mr. Sammons asked Agent Hurst, "got any vids or anything ?" (*Id.* at ¶ 6.) Agent Hurst told Mr. Sammons he was searching for a link to some videos he had downloaded, and asked if Mr. Sammons wanted to see anything in particular. (*Id.*)

2

Mr. Sammons responded, ". . . any young I'll return." (*Id.*) Mr. Sammons also told Agent Hurst, "be hot to custom do vids if you're interested as long as it stays here." (*Id.*) Agent Hurst ultimately sent a link to a cloud account containing damaged (inaccessible) files with suggestive titles. (*Id.*) Mr. Sammons responded with a link to a cloud account containing videos of nude females who appeared to be teenagers and a video of a prepubescent minor engaged in sexually explicit activity. (*Id.*) Mr. Sammons again inquired if Agent Hurst had any videos. (*Id.*)

Mr. Sammons informed Agent Hurst that he would have access to Jane Doe on March 28–29, 2019. (Id. at ¶ 8.) Agent Hurst and Mr. Sammons then made specific plans to exchange live videos of the two men abusing their minor family members (in Mr. Sammons's case, Jane Doe, and in Agent Hurst's case, a fictitious eight-year-old daughter). (*Id.*) During the course of their planning, Mr. Sammons inquired, "what are you wanting to see when I have ? Want to swap vids or ?" (*Id.*) Mr. Sammons requested a photo of Agent Hurst's fictitious victim, whom he believed to be Agent Hurst's eight-year-old daughter. (*Id.* at ¶ 9.) In response, Mr. Sammons sent two photos of Jane Doe in a bathing suit. (*Id.*)

Agent Hurst later told Mr. Sammons that he would only be available to exchange videos on the evening of March 28, and not the morning of March 29. (Gov't's Resp. to Def.'s Mots. to Dismiss, 4, ECF No. 52.) On the afternoon of March 28, Mr. Sammons made efforts to gain access to Jane Doe earlier than originally planned, including calling his wife, who was with Jane Doe and her parents that

3

afternoon. (*Id.*) Mr. Sammons relayed to Agent Hurst, "my wife said she will bring [Jane Doe] trying to get her to meet me closer lol." (*Id.*)

### 2. Chats with TFO Peachey

After learning that the Cw3x Kik profile was accessed by an IP address registered to Brittany Sammons in Westerville, Ohio, TFO Peachey, a central Ohio-based law enforcement officer, was provided with information related to Agent Hurst's ongoing investigation. (Peachey Aff. at ¶¶ 10–12.) On March 25, 2019, TFO Peachey, under cover as a single parent of two minor children, messaged Mr. Sammons. (*Id.*) After a brief conversation, Mr. Sammons sent TFO Peachey one of the photos of Jane Doe in a bathing suit. (*Id.* at ¶ 12.) Mr. Sammons disclosed to TFO Peachey that his name was Chris and that he had a sexual interest in children. (*Id.*) Mr. Sammons also sent two photos of himself to TFO Peachey. (*Id.*) Mr. Sammons described his sexual abuse of Jane Doe to TFO Peachey, including his use of a "butt plug" and an "egg vib" and claimed that he had been abusing Jane Doe for a year. (*Id.* at ¶ 13.) Mr. Sammons advised TFO Peachey that he would have access to Jane Doe on March 28–29, 2019, and that he would "send whatever to you when I have her….I don't keep content like that saved just incase (sic)." (*Id.* at ¶ 14.) Mr. Sammons then messaged to TFO Peachey, "stay up late Thursday [March 28, 2019] I'll send you pics or vids of us…I'll send you something might be around 11ish…..Thursday when I have her what's one thing you want a pic of…Thursday night then want to video call we can show each other are real with the littles….what did you want to see with her?" (*Id.*) Mr. Sammons confirmed the plans with TFO Peachey on March 27, 2019. (*Id.*)

4

### 3. Statements During Arrest

A search warrant was executed on March 28, 2019, prior to Mr. Sammons gaining access to Jane Doe. (*Id.* at ¶ 15.[1]) Mr. Sammons was present on-scene, advised of his *Miranda* rights, and interviewed by TFO Peachey. (*Id.*) Although Mr. Sammons initially claimed any talk of sexual activity with Jane Doe was fantasy, he later admitted that he had been sexually abusing her for a year. (*Id.*) He also admitted that he had taken photos of Jane Doe in the bath tub and of her vagina and had sent them to people he was communicating with online. (*Id.*) He did not recall sending the video of the prepubescent minor to Agent Hurst, but did recall sending the other photos to him. (*Id.*)

### 4. Other Evidence

Jane Doe's parents and Mr. Sammons's wife were also interviewed at the time of Mr. Sammons's arrest. Jane Doe's parents confirmed that Jane Doe was scheduled to stay the night at Mr. Sammons's residence the night of March 28, 2019. (*Id.* at ¶ 16.) They also stated that Jane Doe had been periodically staying the night with Mr. Sammons and his wife for the preceding year. (*Id.*) Mr. Sammons's wife confirmed that, when Jane Doe stayed the night, Mr. Sammons and Jane Doe would be alone at the house for several hours in the morning after she left for work. (*Id.* at ¶ 17.) Mr. Sammons's wife voluntarily produced a "butt plug" and a vibrating egg and handed those items over to law enforcement. (*Id.*)

---

[1] The Court notes an error in the numbering of paragraphs in TFO Peachey's Affidavit. The Court will use the correct paragraph numbers, and not the numbers listed in error in the Affidavit.

Mr. Sammons's cell phone was taken for examination by law enforcement. When law enforcement found the Kik application, which had been hidden, the Cw3x profile was logged in. (*Id.* at ¶ 18.) Forensic tools were unsuccessful at producing any stored or recently deleted child pornography. (*Id.*) However, law enforcement did find the photos of Mr. Sammons that he sent to TFO Peachey, and the photos of Jane Doe in a bathing suit that he sent to both TFO Peachey and Agent Hurst. (*Id.*)

On April 3, 2019, a "forensic interview" was conducted with Jane Doe at the Child Advocacy Center. (*Id.* at ¶ 19.) Jane Doe did not disclose any abuse. (*Id.*)

### B. Procedural Background

On April 23, 2019, a grand jury returned an indictment charging Mr. Sammons with one count of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a); one count of making notice for child pornography, in violation of 18 U.S.C. § 2252(d)(1)(A); one count of making notice for child pornography, in violation of 18 U.S.C. § 2252(d)(1)(B); and one count of distribution of child pornography, in violation of 18 U.S.C. § 2253(a)(1). (ECF No. 13.)

## II.

### A. Mr. Sammons's Motion to Dismiss Count One is denied.

The Court first considers Mr. Sammons's Motion to Dismiss Count One of the Indictment. Count One of the indictment alleges that Mr. Sammons violated 18 U.S.C. § 2251(a) when he employed, used, persuaded, induced, enticed, or coerced Jane Doe to engage in sexually explicit conduct for the purpose of producing or attempting to produce a visual depiction of such conduct. Mr. Sammons moves the Court to dismiss Count One or, in the alternative, exclude any statements made by

Mr. Sammons as they pertain to Count One. In particular, Mr. Sammons seeks to exclude the statements he made to law enforcement at the time of his arrest, in which he effectively confessed to the charged conduct. He argues that the statements must be excluded because they cannot be corroborated with independent evidence sufficient to ensure their reliability (the "corroboration rule"). *See U.S. v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010) (setting forth the corroboration rule) (quoting *Opper v. U.S.*, 348 U.S. 84, 93 (1954)). Mr. Sammons notes that a forensic examination of Jane Doe revealed no physical evidence of his alleged exploitation, a forensic examination of his cell phone revealed no photo or video evidence of his alleged exploitation, and Jane Doe had not acknowledged that the alleged exploitation occurred. He concedes, however, that the content of his statements is consistent with the content of his Kik chats with the undercover officers.

The Government argues in response that Mr. Sammons's motion is not procedurally proper, because it asks the Court to make a determination about factual sufficiency before all of the facts have been developed. As to the merits, the Government argues that its evidence can, in fact, satisfy the corroboration rule. The Government notes that independent evidence shows that Mr. Sammons: made specific plans to exchange depictions of him abusing Jane Doe with TFO Peachey and Agent Hurst; was scheduled to babysit Jane Doe on the date he had arranged to exchange such depictions; and consistently described his previous abuse of Jane Doe to both TFO Peachey and Agent Hurst in separate Kik chats.[2]

---

[2] The Government also notes that its inability to find child pornography on Mr. Sammons's cell phone "corroborates his statement that he was deleting all pictures of that nature or not ever

7

Federal Rule of Criminal Procedure 12 provides, in relevant part: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). The rule "encourage[s] district courts to entertain and dispose of pretrial criminal motions before trial if they are capable of determination without trial of the general issues." *U.S. v. Levin*, 973, F.2d 463, 467 (6th Cir. 1992). Further, although "district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions," they must stop short of "invad[ing] the province of the ultimate finder of fact." *Id*. Nonetheless, it is well-settled that "a defendant may not challenge an indictment on the ground that it is not supported by sufficient evidence. . . ." *Id*. at 468, n.2. As a result, "if a defendant's pretrial motion requires the court to find facts that make up the elements of the case which would normally be reserved to the jury on trial of the general issue, the motion should be denied." *U.S. v. Ledbetter*, Nos. 2:15-cr-80, 2:14-cr-127, 2015 WL 4941812, at *3 (S.D. Ohio Aug. 20, 2015) (quoting *U.S. v. Cumberland Wood & Chair Corp.*, Nos. 91-6058 to 91-6060, 978 F.2d 1259, 1992 WL 317175, at *3 (6th Cir. 1992) (unpublished table decision)).

The Court agrees with the Government's procedural argument and finds Mr. Sammons's Motion to be premature. Mr. Sammons's principal contention seems to be that the Government's case will fail as a matter of law *if* his statements to law

---

saving them on his phone in the first place." (Gov't Resp. to Mots. to Dismiss, 10, ECF No. 52.) This logic presents an obvious Catch-22. The Court is of the opinion that Mr. Sammons's statements that he did not store illicit files on his phone "just in case" can explain the Government's inability to produce such files, but cannot, standing alone, corroborate the statement.

8

enforcement are excluded. But, determining whether the statements are excludible, under Mr. Sammons's theory, would require this Court to consider and weigh all other evidence—as would determining whether Count One then fails "as a matter of law." In either case, it asks the Court to invade the province of the jury. *See Brown*, 617 F.3d at 861–62 (discussing the "tension" between the corroboration rule and later-developed constitutional jurisprudence related to sufficiency-of-the-evidence). As the Government points out, the Court may (and reserves the right to) reject the statements at issue if the prosecution is unable to produce evidence at trial tending to establish their trustworthiness. Mr. Sammons's Motion to Dismiss Count One of the Indictment is **DENIED**.

### B. Mr. Sammons's Motion to Dismiss Counts Two and Three is denied.

Mr. Sammons also moves the Court to dismiss Counts Two and Three of the Indictment. Count Two alleges that Mr. Sammons violated 18 U.S.C. § 2251(d)(1)(A) when he knowingly made and published, or caused to be made and published, notices seeking and offering to receive, exchange, distribute, and reproduce a visual depiction involving the use of a minor engaged in sexually explicit conduct when he sent Kik chats to Agent Hurst seeking to send and receive visual depictions of minors engaged in sexually explicit conduct. Similarly, Count Three alleges that Mr. Sammons violated 18 U.S.C. § 2251(d)(1)(B) when he knowingly made and published, or caused to be made and published, notices seeking and offering participation in sexually explicit conduct with a minor for the purpose of producing visual depictions thereof, when he sent Kik chats to Agent Hurst seeking and

offering to exchange videos depicting Jane Doe and Agent Hurst's fictitious daughter, whom he believed to be eight years old, engaged in sexually explicit conduct.

### 1. Summary of the parties' arguments

Mr. Sammons seeks dismissal of Counts Two and Three, arguing that the one-to-one Kik chats described in the indictment do not constitute "notices" within the meaning of 18 U.S.C. § 2251(d).[3] The statute provides, in relevant part, as follows:

> (1) Any person who, in a circumstance described in paragraph (2), knowingly makes, prints, or publishes, or causes to be made, printed, or published, any **notice** or advertisement seeking or offering–
>
> > (A) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or
> >
> > (B) participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct;
>
> shall be punished as provided under subsection (e).
>
> (2) The circumstance referred to in paragraph (1) is that–
>
> > (A) such person knows or has reason to know that such **notice** or advertisement will be transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed; or
> >
> > (B) such **notice** or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mailed.

---

[3] Neither party argues that the statements constitute "advertisements."

10

18 U.S.C. § 2551(d) (emphasis added). Mr. Sammons argues that "notice," as used in the statute, does not unambiguously apply to non-public, one-to-one communications, and the rule of lenity should be applied in his favor. He asks this Court to adopt the reasoning set out in a recent Eleventh Circuit decision, *U.S. v. Caniff* ("*Caniff II*"), in which the court found that the statute did not unambiguously include the one-to-one text messages at issue in that case. 955 F.3d 1183, 1191 (11th Cir. 2020).

The Government argues that the Court should not adopt the *Caniff II* reasoning, and should instead look to the Ninth Circuit's recent decision in *U.S. v. Cox*.[4] In *Cox*, the court concluded that "one-to-one communications can satisfy the 'notice' requirement under 18 U.S.C. § 2251(d)(1)." 963 F.3d 915, 922 (9th Cir. 2020). The Government asserts that the *Cox* decision is consistent with cases from the Seventh and Tenth Circuits, in which postings made to limited groups were found to comprise "notices" under the statute. *See U.S. v. Franklin*, 785 F.3d 1365, 1369–70 (10th Cir. 2015) (finding that posts visible only to 108 connections on social media site satisfy "notice or advertisement" requirement); *U.S. v. Gries*, 877 F.3d 255, (7th Cir. 2017) (same with respect to messages posted in password-protected chat room with fewer than 40 participants). The Government further proffers as support that similar language found in related provisions of the Federal Sentencing

---

[4] *U.S. v. Cox* was authored by Judge James Gwin, our colleague from the Northern District of Ohio, while sitting on the Ninth Circuit by designation.

11

Guidelines[5] has been construed to apply to one-on-one communications by the Tenth and Third Circuit (*see U.S. v. Garcia*, 411 F.3d 1173, 1179 (10th Cir. 2005) (finding it "clear, based on his explicit statements [made in one-to-one online chats and e-mails,] that [the defendant] was *offering or seeking by notice or advertisement*, a minor to engage in sexual activity"); *U.S. v. Long*, 304 F. App'x 982, 986 (3d Cir. 2008) (defining "notice" to include "communication of information to another party" and finding that one-to-one instant messages requesting photos of minor engaged in sexually explicit conduct constituted notice) (quoting *U.S. v. Harrison*, 357 F.3d 314 (3d Cir. 2004)) and has been applied to such communications without comment by the Fourth, Fifth, and Seventh Circuits (*see U.S. v. Liebert*, 554 F. App'x 173 (4th Cir. 2014) (text messages); *U.S. v. Kamal*, 488 F. App'x 871 (5th Cir. 2012) (online instant messages); *U.S. v. Veazey*, 491 F.3d 700 (7th Cir. 2007) (online chat room and telephonic communications)). Finally, the Government argues that *Caniff II* is an anomaly even within the Eleventh Circuit. *Caniff II* vacated and superseded the court's previous decision in *U.S. v. Caniff* ("*Caniff I*")—which concluded, following a lengthy analysis, that "'notice' can commonly and ordinarily include one-on-one communications like the text messages at issue. . . ." *See* 916 F.3d 929, 933–37 (11th Cir. 2019) *vacated and superseded on reconsideration*, 955 F.3d 1183 (11th Cir.

---

[5] The relevant provisions of the Federal Sentencing Guidelines provide as follows:

"If the offense involved causing, transporting, permitting, or **offering or seeking by notice or advertisement**, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above." U.S.S.G. §§ 2G1.3(c)(1), 2G2.2(c)(1) (emphasis added).

2020).⁶ Three months <u>after</u> *Caniff II* was issued, the Eleventh Circuit issued an unpublished decision in *U.S. v. Orr*, in which a different panel of Judges found that one-to-one text messages between the defendant and a special agent posing as both a minor female and her uncle, in which the defendant repeatedly requested sexually explicit photographs of the fictitious girl, were sufficient to uphold his conviction on eight counts of violating § 2251(d). 819 F. App'x 756, 767 (11th Cir. 2020) (unpublished). The *Orr* court neither mentioned *Caniff II* in its decision, nor reconciled their opposite conclusions.

   **2. Analysis**

Both parties concede that the conduct alleged to be a "notice" under Counts Two and Three are one-to-one Kik chats between Mr. Sammons and Agent Hurst. (Def.'s Mot. to Dismiss Counts Two and Three, 2, ECF No. 51; Gov't's Resp. in Opp'n, 11, ECF No. 52.) Both also concede that neither the Sixth Circuit Court of Appeals nor any of our sister District Courts within the Sixth Circuit have addressed whether "notice," as used in § 2251(d), encompasses a private one-to-one communication. (Def.'s Mot. to Dismiss Counts Two and Three, 5; Gov't's Resp. in Opp'n, 11.) So, to answer that question, we turn to the text of the statute. As the Sixth Circuit recently explained:

> "We endeavor to 'read statutes . . . with an eye to their straightforward and commonsense meanings.'" *Bates v. Dura Auto. Sys., Inc.*, 625 F.3d 283, 285 (6th Cir. 2010) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000)). And we give "terms the ordinary meaning that they carried when the statute was enacted." *Norfolk S. Ry. v. Perez*,

---

⁶ The court reconsidered *Caniff I sua sponte*. Although the decision to reconsider *Caniff I* was largely unexplained in *Caniff II*, it is impossible to miss the similarities between the *per curiam* opinion in *Caniff II* and the dissenting opinion of Judge Newsom in *Caniff I*.

13

> 778 F.3d 507, 512 (6th Cir. 2015). The Supreme Court has called on "judicial interpreter[s] to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." *Hueso v. Barnhart*, 948 F.3d 324, 333 (6th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at p. 167 (2012) and citing *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, — U.S. —, 137 S. Ct. 1002, 1010, 197 L.Ed.2d 354 (2017)).

*Black v. Pension Benefit Guar. Corp.*, — F. 3d —, 2020 WL 5201400, at *3 (6th Cir. 2020). "When [the court] can discern an unambiguous and plain meaning from the language of a statute, [its] task is at an end." *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000) (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 166 (6th Cir. 1995)).

The relevant language in what is now § 2251(d) was first enacted in 1986. Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, § 2, 100 Stat. 3510, 3510 (1986). That language makes it unlawful to "knowingly make[], print[], or publish[] . . . any notice or advertisement seeking or offering" to "receive, exchange, buy, produce, display, distribute, or reproduce" child pornography or participate in any sexually explicit conduct by or with a minor for the purpose of producing child pornography. For the reasons discussed more fully below, this Court declines to adopt the *Caniff II* court's reasoning.

### a) The ordinary meaning of "notice" is not limited by audience size.

The Webster's Third New International Dictionary published in 1986 provides the following definitions of the noun, "notice":

> 1.a.(1) Formal or informal warning or intimation of something; ANNOUNCEMENT
> (2) A warning, announcement, or intimation given a specified time before the event to take place

14

(3) Notification by one of the parties to an agreement or relation (as by an employer to a laborer) of intention of terminating it at a specified time
(4) A communication of intelligence or of a claim or demand often required by statute or contract and prescribing the manner or form of giving it
(5) The condition of being warned or notified
   b. INFORMATION, INTELLIGENCE
   c. KNOWLEDGE

2.a.(1) ATTENTION, HEED, OBSERVATION
   (2) The condition of being noticed
   b. Polite or favorable attention; FAVOR, RESPECT, CIVILITY

3. A written or printed announcement or bulletin

4.a. A critical account or commentary on a play or other public performance
   b. BOOK REVIEW
   c. Critical examination

As the *Cox* court observed, none of these definitions makes reference to an audience size, or limits the word's meaning to publicly available communications. *See Cox*, 963 F.3d at 921. *See also Franklin*, 785 F.3d at 1368 (noting that the dictionary supplied many definitions for "notice" and "none contains a public component"); *Gries*, 877 F.3d at 260 ("In everyday parlance, the term is not limited to warnings or notifications disseminated to the general public, and nothing about the context in which it is used here suggests a more limited meaning."); *Caniff I*, 916 F.3d at 933–34. That observation leads this Court to believe that the ordinary meaning of "notice" does not exclude a one-to-one communication.

### b) "Any" requires an expansive interpretation of "notice."

Congress drafted § 2251(d) to apply to "any" notice or advertisement. The Supreme Court has noted that, "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *U.S. v. Gonzalez*,

15

520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). *See also Harkness v. U.S.*, 727 F.3d 465, 471 (6th Cir. 2013). As the Seventh Circuit noted in *Gries*, "[t]he phrase 'any notice or advertisement' in § 2251(d) casts a wide net for this offense." 877 F.3d at 260. And as the Ninth Circuit noted in *Cox*, "Congress's use of 'any' suggests Congress intended 'notice' to cover any communication that could reasonably fall within that term." 964 F.3d at 921. *See also Caniff I*, 916 F.3d at 934 ("The use of 'any' directs us to interpret 'notice' as broadly as the word will bear."). To this Court, the statute is clear on its face, that "notice" is intended to include a notice of any kind.

### a) "Notice" should not be read as a synonym of "advertisement."

It is well-settled that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181–86 (rev. 6th ed. 2000)). As previously noted, § 2251(d) applies to "any notice or advertisement." The statute communicates to the reader that a "notice" is different from an "advertisement" by use of the disjunctive "or." *See also Bailey v. U.S.*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.") Thus, notice and advertisement should not be rendered synonymous by the Court's interpretation of the statute. At the time the statute was enacted, the ordinary meaning of "advertisement" was, in part, "a **public notice**." Webster's New Third International Dictionary (1986) (emphasis

16

added). Of course, this definition underscores the conclusion that the ordinary meaning of "notice" contemplates private communications. But, *arguendo*, if a "notice" by its nature must be public (*i.e.*, cannot be private), then it is indistinguishable from an "advertisement"—and the words "notice or" are superfluous within § 2251(d).

### b) "Make a notice" is synonymous with "notify."

Finally, the Court turns to the verbs preceding the noun at issue. The parties do not argue that Mr. Sammons printed or published a notice; instead, they focus on § 2251(d)'s prohibition against "mak[ing] . . . any notice." The *Caniff II* court was disturbed by the fact that "the average speaker of American English" would not use the phrase "make a notice" to describe a private communication. *Caniff II*, 955 F.3d at 1189–90. But, "[w]hen 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (quoting 6 Oxford English Dictionary 66 (1933)). In other words, "make a notice" is synonymous with "notify"—a word regularly used by the average speaker of American English to describe both private and public communications.

### c) The Court declines to adopt the *Caniff II* reasoning.

In light of the above analysis, it is the opinion of this Court that the plain meaning of "make[] . . . any notice" is sufficiently broad to include Mr. Sammons's one-to-one Kik chats with Agent Hurst. Mr. Sammons's Motion to Dismiss Counts Two and Three of the Indictment is **DENIED**.

17

## III.

For the reasons stated above, Mr. Sammons's Motion to Dismiss Count One of the Indictment (ECF No. 50) is **DENIED**. Mr. Sammons's Motion to Dismiss Counts Two and Three of the Indictment (ECF No. 51) is also **DENIED**.

**IT IS SO ORDERED.**

    /s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**