## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

UNITED STATES OF
AMERICA,

              **Plaintiff,**       :

    **v.**                   **Case No. 2:19-cr-107**
                                **Judge Sarah D. Morrison**

CHRISTOPHER MICHAEL
SAMMONS,       :

              **Defendant.**

## OPINION AND ORDER

This matter is before the Court for consideration of the Government's Supplemental Motion in Limine to Exclude Expert Testimony Regarding Defendant's Mental Health. (ECF No. 61.) Defendant Christopher Sammons has responded. (ECF No. 66.) The Court heard argument on the motion at a *Daubert* hearing. (*See* ECF Nos. 94, 96.) For the reasons set forth below, the Government's Motion is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

Mr. Sammons faces charges on four counts pertaining to the production and distribution of child sexual abuse imagery (commonly referred to as "child pornography"). (ECF Nos. 1, 13.) The count relevant to the instant motion is Count I, which alleges that Mr. Sammons "did employ, use, persuade, induce, entice, and coerce a minor, specifically Jane Doe, an approximately five-year-old female, to

engage in sexually explicit conduct . . . for the purpose of producing and attempting to produce [a] visual depiction of such conduct[.]" (ECF No. 13.) Mr. Sammons admitted in an interview with law enforcement, after having been apprised of his *Miranda* rights, that he had been sexually abusing Jane Doe for a year, and that he had taken and distributed sexually explicit photos of her.[1]

Mr. Sammons now maintains that this admission was not truthful, and that his confession to Count I was a "false confession." Mr. Sammons seeks to call Scott A. Bresler, Ph.D., to provide expert testimony on the psychological risk factors that may lead to false confessions. Specifically, Dr. Bresler is anticipated to testify that, based on his evaluation and testing of Mr. Sammons, "there are findings to support that Mr. Sammons was very likely to have been vulnerable and compliant with the requests of the interrogating law enforcement officers" which "may shed light on Mr. Sammons['s] contention that he voluntarily gave self-incriminating statements to interrogators, some of which were true, but others which were not." (Proffer of Anticipated Test., ECF No. 81.)

### B.    Dr. Bresler's Report

Before they first met, Dr. Bresler reviewed Mr. Sammons's file, including audio and video recordings of his interrogation by law enforcement. (Hr'g Tr. Vol. I, 15:2–5, ECF No. 97.) He first interviewed Mr. Sammons on August 21, 2020. (*See* ECF No. 74, 2.) Following their initial encounter, Dr. Bresler drafted a two-page summary of his conclusions and recommendations. (*See* ECF No. 65.) Therein, Dr.

---

[1] The balance of the factual background appears in the Court's October 15, 2020 Opinion and Order (ECF No. 59) and will not be repeated here.

Bresler noted that Mr. Sammons "report[ed] struggling with depression for which he takes prescribed medications[,]" "sleeping many hours of the day," and losing "as much as 30 pounds since being incarcerated." (*Id*.) Mr. Sammons also described a history of childhood trauma, including exposure to substance use, witnessing domestic violence, and suffering abuse and neglect himself. (*Id*.) Dr. Bresler concluded:

> At this point in the evaluation, I believe that it is quite possible and certainly plausible that [Mr. Sammons] felt overwhelmed and hopeless at the time he was interrogated by law enforcement. This does not mean that the interrogators did anything wrong or use[d] specifically coercive interrogation techniques. The confession may have been driven by Mr. Sammons' own mental state at the time that he was interrogated and it could have led him to take full responsibility and criminal culpability for some of the accusations placed before him during the interrogative encounter. At present, I am further planning to test Mr. Sammons with psychological tests that seem pertinent to these questions.

(*Id*.)

Dr. Bresler interviewed Mr. Sammons again on November 6, 2020. (*See* ECF No. 74, 2.) During that encounter, Dr. Bresler administered three psychological tests: the Personality Assessment Inventory (PAI); the Gudjonsson Suggestibility Scales (GSS); and the Gudjonsson Compliance Scales (GCS). (*Id*., 9–11.) He later drafted a more robust, twelve-page report summarizing their conversation, Mr. Sammons's testing results, and Dr. Bresler's observations, conclusions, and forensic formulation. (*Id*., *generally*.)

Dr. Bresler's report first describes the "Circumstances of the Evaluation," which include Mr. Sammons's life inside the jail. (*Id*., 1.) Dr. Bresler repeated Mr. Sammons's reports that he slept for large portions of each day, lost 30 pounds after

being incarcerated, and was prescribed anti-depressant medication. (*Id.*) Dr. Bresler clarified that "Mr. Sammons was not prescribed any psychotropic medications prior to jail." (*Id.*) He also noted that "Mr. Sammons informed about classes he has taken including a Seeking Safety class for PTSD, a Substance Use Disorders class, and an Anger Management class." (*Id.*)

Dr. Bresler next summarized his observations of Mr. Sammons's "Mental Status." (*Id.*, 2.) He assessed that

> [t]hroughout the initial interview . . . , [Mr. Sammons] was cooperative, polite and pleasant, though he presented with dysphoric mood and blunted affect. He was found to be well oriented to person, place, time, and circumstance. He fully understood the reasons for th[e] evaluation . . . . The reasons for this evaluation as explained by [Mr. Sammons's attorney] included questions regarding the interrogation conducted with Mr. Sammons and issues pertaining to symptoms of mental illness. It was observed that Mr. Sammons was able to express his ideas coherently without any evidence of paranoid distress. He spoke fluently in a normal tone, with appropriate volume, and at a regular pace. There was no evidence of thought disorder such as thought blocking, tangential responses, circumstantial answering, etc. At no point in the interview with Mr. Sammons did he appear internally preoccupied, nor did he express any strange ideas suggesting that he labored with underlying psychosis. . . .

(*Id.*) Dr. Bresler went on to summarize Mr. Sammons's descriptions of abuse and neglect suffered as a child, with some additional details about his family make-up and current limited contact with his mother and siblings. (*Id.*, 2–3.)

In a section titled "Mental Health History," Dr. Bresler noted that "Mr. Sammons has no history of formal mental health diagnoses, nor has he ever received mental health treatment prior to his incarceration." (*Id.*, 3.) Despite that, Mr. Sammons reported to Dr. Bresler that he attempted suicide as a child and has

had some suicidal ideation since returning from Afghanistan, where he was deployed with the Army. (*Id.*)

Dr. Bresler then turns to Mr. Sammons's "Education" and "Employment History." (*Id.*, 3–5.) Upon graduation from high school, Mr. Sammons enlisted in the Army, where he served for more than three years. (*Id.*, 4.) Dr. Bresler noted that Mr. Sammons "spoke proudly of his service in the military and his commitment," describing the recognition he received from his commanding officers because he was reliable and punctual. (*Id.*) Mr. Sammons did note that "he witnessed many casualties while in Afghanistan, but . . . did not participate in combat himself[.]" (*Id.*) Mr. Sammons reported that his wife noticed a difference in his behavior when he returned from deployment. (*Id.*, 5.)

Next, Dr. Bresler summarizes Mr. Sammons's reports of his "Relationship History." (*Id.*, 5–6.) He supplements this summary with information learned in an interview with Mr. Sammons's estranged wife. (*Id.*, 6.) She reported that the marriage was stressed, in part because of a medical determination that she was unable to become pregnant. (*Id.*)

Dr. Bresler then turns to "Criminal History/Deviant Behavior," which includes Mr. Sammons's account of his interrogation:

> Mr. Sammons detailed the police interview, his subsequent arrest, and the criminal charges against him. He denied ever being threatened during either his arrest and/or subsequent interview/interrogation. However, he described that he later recanted his confession to police and assured that he, in fact, never touched [Jane Doe] inappropriately or took explicit sexual photos of her. Mr. Sammons remembered feeling humiliated when he was arrested as his neighbors witnessed the FBI take him into custody. He indicated feeling pressured when told by

5

police, "It's time to be a man," though he clarified this pressure came more from him rather than any external pressure from police. Mr. Sammons disclosed that he felt like if he played along with the police, they would let him go back home: "If I give them what they want to hear, they'll leave me alone." He remembered feeling "overwhelmed" at the time and he was accountable for the confession: "I have to take responsibility at the end of the day."

(*Id.*, 7.) Later in the report, Dr. Bresler continued:

Mr. Sammons described talking to two individuals from the FBI and how the arrest was unexpected. He admitted that some of what the FBI agents accus[ed] him of doing was accurate. However, Mr. Sammons insisted that while some of the accusations were true, he "went along with" other accusations that were false. When specifically asked if he believes he told the FBI things during the interview that were not factually true, he replied, "Yes, the sexual acts that they were accusing me of doing, at first I denied it. Then they told me to 'Be a man and admit it.' And I went along with everything they said." He explained his reason for doing so to be: "It was easier to go with it. I felt like everything was ruined already. It's just a losing battle to fight against it." He described feeling at that time quite "overwhelmed, like the world came crashing down." Mr. Sammons explained that he thought at the time if he admitted to only some of the accusations, the FBI would not have accepted it: "They told me, 'Why would you go through all this trouble and then not do it?' I felt like no matter what I was going to say, they were already there. When it happened, I thought my life was over anyways. The damage was done. Would anyone even believe me at that point?"

(*Id.*, 9.) Under the heading "Observations of the Police Interview/Interrogation," Dr.

Bresler gave his own impressions:

Mr. Sammons was interviewed by law enforcement (FBI) on March 28, 2019. In general, the interview did not appear to be coercive and I observed no intimidation tactics being used. Mr. Sammons was read his Miranda Rights and subsequently, he seemed willing to talk without a lawyer present. It was made clear to him that he was not under arrest, that law enforcement simply wanted to hear what happened in his own words. . . .

(*Id.*, 8.)

6

Dr. Bresler then moves to the results of psychological testing. (*Id.*, 9–11.) Mr. Sammons's PAI results, as interpreted by Dr. Bresler, "revealed several clinical elevations including significant depressed mood." (*Id.*, 10.) The results also revealed a Negative Impression Management (NIM) score of 84, which Dr. Bresler explained as follows:

> Mr. Sammons' [NIM score] showed a significant elevation indicating that he endorsed many symptoms associated with extreme stress and significant psychological maladjustment. Some people generate elevated NIM scores on purpose with a desire to exaggerate one's symptoms. However, based on Mr. Sammons' current legal situation and reported history, he likely falls into a different subgroup of test-takers who are experiencing significant distress and emotional problems.

(*Id.*)

Before disclosing the results of Mr. Sammons's GSS testing, Dr. Bresler described its purpose:

> [The GSS] assesses the degree of interrogative suggestibility an individual has, that is, "the extent to which people come to accept messages communicated during formal questioning, as a result of which their behavioral response is affected." Suggestibility can have different ways of manifesting itself and on the GSS it is measured in two ways, Yield and Shift. Yield refers to the tendency of someone to give in to leading questions, whereas Shift refers to how a person copes with interrogative pressure.

(*Id.*, 10–11.) Dr. Bresler went on to note that the GSS revealed that Mr. Sammons "has no memory problems whatsoever." (*Id.*, 11.) Mr. Sammons's "Total Suggestibility score was 13, which is higher than scores amongst those in the general population." (*Id.*) Dr. Bresler later revised this finding to characterize Mr. Sammons's Total Suggestibility score as average to slightly above average. (Hr'g Tr. Vol. I, 59:6–8, 71:14–15.)

Finally, Dr. Bresler administered the GCS to Mr. Sammons, explaining its purpose as follows:

> Compliance differs from suggestibility in that it does not require that an individual privately accept what they are being told or requested, but they still go along with the request. In other words, a highly compliant individual chooses to consciously fulfill another's request regardless of whether he or she privately agrees with it.

(ECF No. 74, 11.) Dr. Bresler then revealed that "Mr. Sammons' GCS score was 19 out of 20 possible points, which is above the 95th percentile for those who are suspecting of being false confessors." (*Id.*) In Dr. Bresler's interpretation, "[h]is score indicates an extremely high degree of compliance." (*Id.*) Dr. Bresler also administered the GCS to Mr. Sammons's estranged wife, asking her to provide her impression of Mr. Sammons's level of compliance. (*Id.*) "Of the 14 test items she was able to answer, she endorsed 11 to be true for Mr. Sammons, which rated him above average on the character trait of compliance (79th percentile)." (*Id.*)

Dr. Bresler concludes that the test results "indicate[] that someone like Mr. Sammons is likely to have an increased tendency to comply with requests and obey instructions from [] authority figures." (*Id.*)

In a section titled "Conclusions and Forensic Formulation," Dr. Bresler states:

> Based on my interviews with Mr. Sammons and his estranged wife, my review of the police interview/interrogation, and psychological testing with the PAI, GSS, and GCS, there are findings to support that Mr. Sammons may have admitted to having done certain unlawful acts when in fact, he did not do them. In a close and careful review of the actual interview/interrogation conducted by the FBI, I saw little evidence to support that Mr. Sammons was coerced to confess. However, a variety of personality traits may have positioned him to fabricate details of crimes he initially had denied, but then he later claimed to have

8

committed. One of these personality factors seem to be related to the abuse he endured as a child. Such abuse is known to instill fear in its recipient and by extension, persons who have experienced such abuse tend to carry out demands from persons in authority more easily than others from healthier upbringings. Mr. Sammons learned at an early age to behave in ways to appease those in positions of power. In fact, he utilized these adaptive skills to his benefit upon becoming an adult, enlisting in the Army and excelling in that service. He reported always being the right-hand man to his commanding officers, even showing up to work early every day. Exacerbating these underlying personality traits, Mr. Sammons reported feeling overwhelmed with a sense of hopelessness and shame at the time he was questioned by law enforcement. He said he was proud to have built a life to support his wife and him, and all of this was quickly shattered by his arrest. He had this secret, that is, that he was sexually excited by thoughts and images of prepubescent females. When it was discovered, he felt that his life was over. It seems quite possible that Mr. Sammons outlined a story during the questioning by the FBI that in part fit their narrative of what crimes he had committed. This may have [oc]curred because of his tendency to appease authority figures combined with debilitating feelings of shame and hopelessness about his future at that time.

(*Id.*, 11–12.)

## C.     Procedural Background

The Government's Motion in Limine seeks to exclude Dr. Bresler's testimony.

(ECF No. 61.) A *Daubert* hearing spanned March 31, and April 15, 2021, during

which the Court heard from Dr. Bresler and the Government's proposed rebuttal

expert, Scott D. Bender, Ph.D., ABPP-CN. (*See* ECF Nos. 94, 96.)

## II.     STANDARD OF REVIEW

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule incorporates the Supreme Court's instruction in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee's notes to 2000 and 2011 amendments. This Court serves as a "gatekeeper," tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The proponent of the expert testimony bears the burden of proving its admissibility. *See* Fed. R. Evid. 104(a); *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

The Court is afforded "considerable leeway" both in determining *whether* to admit expert opinion testimony and *how* to test its reliability and relevance to the case at bar. *Kumho Tire*, 526 U.S. at 152. Nonetheless, the Federal Rules of Evidence provide a "permissive backdrop," favoring the admission of expert opinion testimony. *Daubert*, 509 U.S. at 588–89. The permissive backdrop is particularly important in the criminal context, where a defendant's right to present a complete defense is protected by the Constitution. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (finding that exclusion of expert testimony "deprived [the defendant] of his fundamental constitutional right to a fair opportunity to present a defense").

10

Even if the Court determines that expert testimony is relevant, it may nevertheless be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

## III.   ANALYSIS

Although Dr. Bresler has sufficient experience, education, and training to be qualified as an expert, the Court has concerns about both the reliability of the methods employed and the relevance of the proposed testimony which, viewed together, require exclusion of Dr. Bresler's testimony. The Court further finds that any probative value of Dr. Bresler's proposed testimony is outweighed by its prejudicial effect. Finally, the Court is satisfied that the exclusion of Dr. Bresler's testimony does not foreclose Mr. Sammons's ability to present a complete defense.

### A.   Qualifications

The parties do not dispute that Dr. Bresler has impressive qualifications. He currently serves as Clinical Director of the Division of Forensic Psychiatry at the University of Cincinnati, where he is also an Associate Professor in the Department of Psychiatry and Behavioral Neuroscience. (ECF No. 62-1.) Dr. Bresler holds a

Bachelor's Degree in psychology, Master's Degrees in teaching and clinical psychology, and a Doctorate in clinical psychology. (*Id*.) He has been practicing clinical psychology for over 30 years and has served more than 15 as Clinical Director. (*Id*.) Dr. Bresler has received training in child sexual abuse investigations and advanced certification in interviewing and interrogation. (*Id*.) He is a member of numerous professional organizations and served as the 2003 Program Chair for the American Academy of Forensic Sciences Psychiatry & Behavioral Sciences section. (*Id*.) He has authored or co-authored numerous publications, including a 2008 paper entitled "Overshadowing Innocence: Evaluating and Challenging the False Confession." (*Id*.) Finally, Dr. Bresler has given a number of professional presentations, including at least nine on the topic of false confessions. (*Id*.) Dr. Bresler is qualified by his experience, education, and training to testify on the psychological risk factors that may lead to false confessions.

### B. Reliability and Relevance

Before applying the *Daubert* factors of reliability and relevance to Dr. Bresler's proposed testimony, the Court wishes to note its understanding that false confessions do occur. *See, e.g., DNA Exonerations in the United States*, INNOCENCE PROJECT, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited Apr. 21, 2021) (noting that 29% of the DNA exonerations in the United States to date involved a false confession). The Court further understands that scientific research has identified certain situational and psychological factors that, when present, may support the proposition that a confession was false. *See Resolution on Interrogations of Criminal Suspects*, AMERICAN PSYCHOLOGICAL

ASSOCIATION (Aug. 2014), https://www.apa.org/about/policy/interrogations (collecting studies). Nonetheless, the Court must engage in a fact-specific inquiry, analyzing *Dr. Bresler's* report and proposed testimony in the context of *Mr. Sammons's* case. That inquiry raises significant concerns and commands exclusion of the proposed testimony.

### 1.    Reliability of Methods and Application

The Government argues that the methods used by Dr. Bresler are unreliable because the GCS[2] lacks validity scales, has no known error rate, and is highly vulnerable to manipulation by the test-taker. The Court agrees.

At the hearing, Dr. Bresler testified at length about the various tests he administered to Mr. Sammons, and upon which he based his opinion. He explained that the PAI includes embedded validity scales, but that the GSS and GCS include none. (Hr'g Tr. Vol. I, 25:14–19.) He further explained that it is common to "pair" the GSS and GCS with tests that include validity scales. (*Id. See also, id.*, 22:15–25.) "[B]y combining them together, we make an inference, and the inference is that if a person produces a valid test protocol with the PAI, based upon the validity indices in the PAI . . ., then by extension we can assume that that individual is in fact being consistent and . . . not malingering or exaggerating symptoms, et cetera." (*Id.*, 25:20-25.) He further noted that the GCS is often compared to responses

---

2 The Court also heard testimony that the GSS lacks validity scales. However, Dr. Bresler conceded in testimony that he didn't believe the GSS score was "really that relevant," because he "do[es]n't think that [Mr. Sammons] succumbed to suggestibility[.]" (Hr'g Tr. Vol. I, 57:17–20.)

provided by a third-person *about* the test-taker, as "sort of a validity check." (*Id.*, 26:1–5.)

Dr. Bresler testified that the PAI contains several validity scales—including the Negative Impression Management scale, the Malingering Index scale, and the Rogers Discriminate Function scale. (*Id.*, 30:8–17.) He further testified that "the Negative Impression Management validity scale within the PAI is known not to be a good scale to use to try to identify people who are lying who are incarcerated." (*Id.*, 29:15–18.) He went on to explain that the Malingering Index scale and Rogers Discriminate Function scale are superior to the NIM in determining whether such a test-taker is malingering, exaggerating their symptoms, or engaging in deception. (*Id.*, 30:8–17.) Dr. Bresler testified that Mr. Sammons is "well below the cutoff" on both the Malingering Index and Rogers Discriminate Function scales, but admits that he did not include those results in his report. (*Id.*, 30:14–24; 55:24.)

The Government's rebuttal expert, Dr. Bender, suggests that the combination of tests used by Dr. Bresler is not reliable to show that an individual is compliant. (*See* ECF No. 91-2.) In particular, he is concerned that the GCS results are unvalidated. (*See* Hr'g Tr. Vol. II, 134:8–12.[3]) Dr. Bender explains that the concern is particularly acute for the GCS, as compared to the GSS, because the test questions are "very face valid," which he explains to mean that "the person reading the statements will clearly know what's being asked. And all you have to do is endorse those questions again and again, and you can appear to be compliant even

---

[3] All citations to Hr'g. Tr. Vol. II are to the "rough" transcript prepared for the Court's use in rendering this Opinion and Order.

if you are not." (*Id.*, 134:21–135:1.) In other words, the GCS is particularly "vulnerab[le] to feigning and malingering." (*Id.*, 135:5.)

The defense notes that the *Daubert* standards are not implicated simply because two experts disagree, and argues that both Drs. Bresler and Bender should be permitted to present their competing views to the jury. The Court agrees as to the first point—but this is not just a disagreement between experts. What is troubling is that Dr. Bresler (i) relies heavily on the GCS to formulate his opinion, (ii) ties the GCS to the PAI for use of its validity scales, (iii) includes only the NIM in his report, and then (iv) testifies that the NIM is "not [] a good scale to use" for people like Mr. Sammons. Dr. Bresler's own testimony undermines any credibility that the PAI could lend to the GCS—and leaves it with none.[4] Moreover, Dr. Bresler acknowledges that the GCS has no known error rate and is highly susceptible to manipulation by the test-taker. He even acknowledges that Mr. Sammons could have "changed the story" and manipulated his GCS responses after having been told that the Government had "no other evidence" against him on Count I. (*Id.*, 35:13–17.)

On holistic review, the Court is not convinced that the GCS, as used here, holds any water. In the words of our sister district, it "is nothing more than guesswork." *U.S. v. Deuman*, 892 F. Supp. 2d 888 (W.D. Mich. 2012) (excluding false confessions expert testimony on reliability grounds).

---

[4] The Court is not persuaded that Mrs. Sammons's partial completion of the GCS with respect to Mr. Sammons is, on its own, a reliable indicator of validity. Mrs. Sammons was unable to complete the entire test and she is similarly capable of manipulating the test results.

### 2.     Relevance of Opinion

To complete the *Daubert* analysis, the Court must determine whether the proposed testimony will "assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. The Supreme Court invoked a wonderful analogy to illustrate this component (interchangeably referred to as "helpfulness," "fit," or "relevance"):

> The study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*Id*. at 591.

In addition to the reliability concerns laid out above, the Court has concerns about the relevance of Dr. Bresler's opinion. Dr. Bresler's opinion points only to the character trait of "compliance" to explain why he may have given a false confession to Count I. Dr. Bresler defines "compliance" in the following way:

> Compliance differs from suggestibility in that it does not require that an individual privately accept what they are being told or requested, but they still go along with the request. In other words, a highly compliant individual chooses to consciously fulfill another's request regardless of whether he or she privately agrees with it.

(ECF No. 74, 11.) Compliance is similarly understood in common parlance as:

1  a :   the act or process of complying to a desire, demand, proposal, or regimen or to coercion

   b :   conformity in fulfilling official requirements

2 :     a disposition to yield to others . . .

*Compliance*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/compliance (last visited Apr. 22, 2021). Both definitions describe a tendency to *respond* in a certain way to a *request or demand*. But here, there is no indication that the law enforcement officers who interviewed Mr. Sammons requested or demanded that he confess.[5] Dr. Bresler testified that, on review of the video and audio footage of the interview, he "didn't see anything that constituted coercion." (Hr'g Tr. Vol. I, 75:20.) Instead, it appeared that Mr. Sammons "just rolled over." (*Id.*, 75:16.) Absent any request or demand made on him, it is difficult to understand how an opinion as to Mr. Sammons's compliant personality is relevant to the question before the jury. *See U.S. v. LaVictor*, 848 F.3d 428, 441–42 (6th Cir. 2017) (citing *U.S. v. LeBlanc*, 45 F. App'x 393, 400–01 (6th Cir. 2002)) (distinguishing *LeBlanc*, in which the court excluded expert testimony on child suggestibility absent allegation of coercive or suggestive questioning, from present case, where "ample evidence" existed to suggest that defendant and victim were engaged in an abusive relationship, supporting expert testimony on domestic violence victim recantation).

Citing *United States v. Whittle*, the defense argues that Dr. Bresler's opinion is helpful to the jury in light of the "common misperception among the public [] that one a person confesses to his guilt, he must be guilty." No. 3:13-CV-00170-JHM, 2016 WL 4433685, at *3 (W.D. Ky. Aug. 18, 2016) (citing *U.S. v. Hall*, 974 F. Supp.

---

[5] Although Mr. Sammons told Dr. Bresler that he felt pressured by the officer's statement, "Be a man," Dr. Bresler stated in his report and testified at the hearing that he did not observe coercive interrogation tactics.

1198, 1206 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999)). The Court does not dispute that the misperception exists. But the expert opinion offered in *Whittle* was relevant to the facts of that case in a way that Dr. Bresler's, here, is not.[6]

### C. Probative and Prejudicial Value

To the extent Dr. Bresler's opinion has probative value, it is substantially outweighed by the risk of misleading the jury. *See* Fed. R. Evid. 403. The Court has significant doubts as to whether expertise in forensic psychology is necessary for a jury to understand the issues in this case. "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury . . . ." *U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). A review of two cases discussing the utility and admissibility of expert testimony on false confessions illustrates this concern.

On one end of the spectrum, we have *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995). In *Shay*, the First Circuit found that the district court committed reversible error in excluding expert testimony on the impact of the defendant's

---

[6] The *Whittle* court observed,

> The Court agrees that the defendant should be able to proffer a psychological expert to explain to the jury that some defendants give . . . false confessions to a crime, and that Defendant has psychological traits that make it possible that he would give a false confession. [The expert] has identified potential mental and psychological conditions along with sever environmental stressors (sleep deprivation, drug and alcohol use and withdrawal, unrelated emotional distress, etc.) that may have caused Defendant to have been mentally compromised or more susceptible to giving a false confession to law enforcement.

*Whittle*, 2016 WL 4433685, at *4.

18

"mental disorder" on the likelihood that he gave a false confession. The defendant suffered from pseudologia fantastica (also known as Munchausen's Disease), a condition that causes a patient "to make false and grandiose statements without regard to the consequences." *Id*. at 128. The court concluded that

> whether or not the jury had the capacity to *generally* assess the reliability of [the defendant's self-incriminating] statements in light of the other evidence in the case, it plainly was unqualified to determine without assistance the *particular* issue of whether [the defendant] may have made false statements against his own interests because he suffered from a mental disorder.

*Id*. at 133. It was, therefore, important that the defense be allowed to present expert testimony from a psychiatrist that the defendant "suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his apparent self-interest" against incrimination. *Id*.

On the other end, we have *United States v. Adams*, 271 F.3d 1236 (10th Cir. 2001). In *Adams*, the Tenth Circuit upheld the district court's exclusion of expert testimony that the defendant's "low neurocognitive functioning and dependent personality structure 'strongly raise [] the possibility, [given other evidence in the case], that he was not telling the truth when he made incriminating statements to [law enforcement].'" 271 F.3d 1236, 1246 (10th Cir. 2001). The district court had held "that the report was little more than a professionally-trained witness testifying that, based upon his history, '[the defendant] is the type of person who would have lied about his involvement to the police.'" *Id*. The Tenth Circuit agreed, adding that "[t]he offered testimony does little more than 'vouch for the credibility of another witness' and thereby 'encroaches upon the jury's vital and exclusive function to

19

make credibility determinations.'" *Id.* (quoting *U.S. v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999)).

The case now before the Court falls far closer to *Adams* than to *Shay*. Dr. Bresler did not diagnose Mr. Sammons with any metal condition or disorder that correlates with an increased likelihood of giving a false confession.[7] (*See* ECF No. 74.) Instead, his opinion derives from the GCS results and his interviews with Mr. Sammons and, to a lesser extent, his estranged wife. (*See* Hr'g Tr. Vol. I, 82:1–83:20.) During the *Daubert* hearing, Dr. Bresler summarized his opinion as follows:

> [Mr. Sammons] has historical factors in his life that are the kinds of historical factors that we will sometimes see in false confessions[.]

(Hr'g Tr. Vol. I, 102:22–24.) That statement bears striking resemblance to the *Adams* court's characterization of properly-excluded expert testimony. This Court must agree: Dr. Bresler's proposed testimony does little more than vouch for Mr. Sammons's credibility, with the force of a PhD. *See Deuman*, 892 F. Supp. 2d at 890 (recognizing that "the potential for undue prejudice and misleading the jury is significant because the jury may well assign undue weight to [expert's] testimony in deciding issues of credibility" where court found that testimony did not fit the facts of the case).

---

[7] Dr. Bresler diagnosed Mr. Sammons with pedophilic disorder and indicates that, at the time of the interview, he was being treated for depression. Although Dr. Bresler discusses the possibility that Mr. Sammons suffered from post-traumatic stress disorder or related symptoms, he does not render such a diagnosis or tie it to the likelihood of falsely confessing.

### D. Alternative Methods of Presentation

Despite the exclusion of Dr. Bresler's proposed testimony, the Court believes Mr. Sammons's constitutional right to present a full defense is unimpeded. Mr. Sammons will be able to pose and explain to the jury his position that he falsely confessed to Count I, through means such as voir dire, opening argument, physical evidence, lay witness testimony, cross-examination, jury instructions[8], and closing argument. As explained in detail above, the reasons why Mr. Sammons supposedly provided falsely self-incriminating statements is not dependent on specialized knowledge and a jury is fully capable of understanding those reasons without their presentation by an expert.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that Dr. Bresler's expert opinion testimony is inadmissible at trial. The Government's Motion (ECF No. 61) to exclude Dr. Bresler's testimony is **GRANTED**.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

---

[8] *See, e.g., Deuman*, 892 F. Supp. 2d at 891 n. 4, 891–92 (citing *U.S. v. Jacques*, 784 F. Supp. 2d 59 (D. Mass. 2011)).